# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 6, 2007 Session

## STATE OF TENNESSEE v. TOMMY L. HOLMES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-02082      Joseph B. Dailey, Judge**

---

**No. W2006-00236-CCA-R3-CD  - Filed June 7, 2007**

---

The defendant, Tommy L. Holmes, was convicted of aggravated rape, a Class A felony, and sentenced as a violent offender to twenty-four years in the Department of Correction.  He presents six issues on appeal:  (1) whether he forfeited his right to counsel; (2) whether the jury was properly instructed on lesser-included offenses; (3) whether the evidence was sufficient to establish the bodily injury element of aggravated rape; (4) whether the trial court erred in answering the jury's question regarding what constitutes bodily injury; (5) whether there was prosecutorial misconduct during closing argument; and (6) whether the trial court erred by excluding certain evidence the defendant offered.  Following our review, we conclude that his claims are without merit.  However, we additionally conclude that, before determining that the defendant had forfeited his right to counsel, the trial court should have conducted an evidentiary hearing. Accordingly, we remand to the trial court for an evidentiary hearing as to this claim.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Vacated and Remanded in Part

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Tommy L. Holmes.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Valerie Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

Prior to trial, the trial court appointed an attorney to represent the defendant. Subsequently, appointed counsel was allowed to withdraw, with the defendant representing himself at trial, assisted by "elbow counsel."

At trial, the victim testified that on June 23, 2001, she went to the home of her boyfriend's mother in South Memphis for a barbecue, arriving between 11:00 a.m. and 12:00 p.m. About seven people were at the gathering, some of whom were drinking alcohol and smoking marijuana. The victim acknowledged that she smoked marijuana "around about" 9:00 or 10:00 p.m. The victim's boyfriend, Ephram Williams, introduced her to the defendant at the party and later asked him to take her home because he did not have a car. She left with the defendant and "a couple of his friends" about midnight. The defendant took his friends to "the rooming house down the street," and then took her home where she "went in to tell [her] sister that [she] was with [the defendant] and [she] would be back in a couple of hours or so." Asked where she planned to go with the defendant, the victim said, "Just riding around with him, smoke a little mari[j]uana." She explained that she went with the defendant because she "didn't have nothing to do – wasn't ready to go home. And I didn't figure he would hurt me because he seemed like a gentleman."

The victim said that she and the defendant stopped at a gas station where they bought a "six pack" of wine coolers before going to a hotel "because [the defendant] said he wanted to sit down and chill and talk." The victim explained why she would willingly go to a hotel room under these circumstances:

> For kickin' it – like we supposed to had been doing – smoking mari – weed
> – I mean mari[j]uana. Sit down, talking. You know, I wasn't scared because that
> weren't the first time that I had did it before. You know, he didn't give me no signs
> of, you know, he was going to hurt me or anything.

The defendant gave the victim "forty or fifty dollars to go in [the hotel] and pay for a room," and they went to the room where they talked, watched television, and continued drinking for "about thirty or forty-five minutes." When the victim got up to blow her nose, the defendant attacked her from behind. He "grabbed" her, threw her in the bathtub, and started hitting her on the head and face. As the defendant ripped her clothes off, he said, "Take your clothes off, Bitch." The defendant threw her around the room, put his penis in her mouth, and made her perform oral sex on him, saying he was going to kill her if she did not comply. She said that he also put his penis in her vagina and anus and that he ejaculated in her anus. The victim said that afterwards, the defendant was "[t]alking crazy – just still talking crazy . . . calling me bitches and whores. He was going to kill me. He was going to kill my little girl's daddy – just constantly saying the same stuff over and over . . . [b]ecause he know he had done a bad thing – he had done something wrong." The defendant then "grabbed" her again, "laid across the bed with [her] and fell asleep."

The victim explained why she did not try to flee:

> Oh, Lord. I didn't go because I was so terrified of what had just happened to me. I had never been through nothing like that in my life. I had got scared and forgot where I was and just stood in the middle of the floor dazed before I had even called the police; before I had did anything. I just stood in the middle of the floor dazed. I couldn't believe that that had just happened to me.

Asked if there were any weapons in the room or anything that she was lead to believe was a weapon, the victim said, "Yeah. . . . Your fist."

The victim said that she remembered calling 9-1-1 from the hotel room and that the defendant was still asleep when the police arrived but fought with them while being arrested. The police took the victim to the Memphis Sexual Assault Resource Center were she underwent a physical examination. As to her injuries, the victim testified, "I had a knot. I wasn't swollen, but I had knots in my head." She also said that she had pain in her head, face, and rectum. She said that she did not struggle with the defendant because he was "twice [her] size."

Dan Farrar, a communications supervisor with Memphis Police Communications, testified that their records showed that the victim placed three 9-1-1 calls from the hotel room, beginning at 4:15 a.m. on the day of the offense. One of the taped calls was played for the jury.

Sally Discenza, a forensic sexual assault nurse examiner with the Memphis Sexual Assault Resource Center, testified regarding the examination she conducted on the victim on the morning of the offense. She found no trauma to the victim's vagina or anus. Although there was no bruising or marks on the victim's skin, Discenza explained that "sometimes it can take up to a day or two to actually see discoloration" and that it is more difficult to see such marks on a "darker-complected individual" like the victim. On cross-examination, Discenza acknowledged that she asks patients to return to the center if bruises or abrasions develop after the examination and that the victim did not return.

Hyun Kim of the Memphis Sexual Assault Resource Center testified that a rape kit was taken of the defendant and sent to the Tennessee Bureau of Investigation ("TBI") for testing. Qadri Yyah Debnam, a special agent forensic scientist with the TBI's Memphis Crime Laboratory, testified that both the vaginal and anal swabs taken from the victim tested positive for the presence of semen. Debnam also said that DNA analysis indicated that the semen was the defendant's.

Dorothy Bryant testified that she rented a car to the defendant on June 23, 2001. She retrieved the car, which had been damaged, from a hotel on Third Street the following day.

## ANALYSIS

### I. Forfeiture of Counsel

The first issue raised on appeal is whether the trial court violated the defendant's right to the assistance of counsel by allowing appointed counsel to withdraw and refusing to appoint a replacement. In our analysis, we first will summarize the circumstances that culminated in the defendant's acting *pro se* at trial.

Approximately one week before the defendant originally was scheduled to be tried, on March 27, 2003, at an impromptu hearing at which the defendant was present, appointed counsel requested the trial court's permission to withdraw from the case, saying that the defendant had been verbally and physically abusive:

> On two occasions, Your Honor, including this morning – the reason I had [the defendant] brought up was so I could visit with him up here. He has threatened physical violence in the past at our last meeting. Today he put hands on me and I had to leave. He punched me in the face with his finger, knocked my glasses off. And I don't believe that I can represent [the defendant]; so I'm asking the Court to relieve me.

The trial court permitted the withdrawal, explaining that it accredited appointed counsel's allegations, that there would not be a hearing on the matter, and that the court would not appoint another lawyer to represent the defendant:

> I will relieve you under those circumstances, and we've been faced with this–
>
> First of all, I'll state for the record that I don't find there to be a need to have a formal hearing in this regard. [Appointed counsel] is a lawyer that's practiced in this court for many years. I know him to be a man of impeccable integrity, and if he says that happened, as an officer of this court, then I accept his statement that that is what happened.
>
> Now, if I'm told by the Court of Criminal Appeals that taking the word of a lawyer, an officer of the court, is not good enough in circumstances such as this, then so be it. We'll come back and we'll have a full formal hearing on this issue. But as far as I'm concerned, the statement of [appointed counsel] regarding the incident that happened in the back and the threats of violence happened and are true as he stated it.
>
> That's the start of my analysis, and beyond that, I don't think that [appointed counsel] or any other lawyer should be required to endure that kind of threat or intimidation in representing a client. That's not in his job description. Beyond that, he's representing his client, [the defendant], at taxpayers' expense. [The defendant] didn't go out and hire a lawyer. He has the taxpayers of the [S]tate of Tennessee to thank for having an outstanding lawyer, such as [appointed counsel], appointed to represent him.

-4-

. . . .

. . . I'm not sure that you reward an individual who is for whatever reason dissatisfied with his attorney and decides to threaten bodily harm and knock his glasses [off] him, you reward him by then allowing that attorney to be relieved and appoint[ing] another lawyer. That seems to me to be a very convoluted way of appointing lawyers to represent individuals. If a defendant chooses to take action such as [the defendant] took today, he does so at his [own] peril and the result is he is going to be representing himself unless he –

You're always welcome to hire a lawyer if you've got money to hire a lawyer, but if you can't hire a lawyer, then you're on your own. If you threaten lawyers, if you knock their glasses off of them, you're on your own. I'm not going to require some other lawyer to come in and try to represent you at taxpayers' expense and have to look over his shoulder and worry about physical harm or worry about getting punched in the face when he is talking to you. That's just not in their job description.

So, from this point forward, unless you're able to hire a lawyer, you or your family able to hire a lawyer privately, you better read [up on] the rules of criminal procedure and rules of evidence because you're going to be representing yourself.

Appointed counsel turned over the discovery materials he had received from the State to the defendant, and the trial court subsequently denied his written motion for the appointment of counsel.

During a May 15, 2003, hearing on pretrial motions, the defendant informed the trial court that he needed a lawyer and asserted that appointed counsel's allegations were false, but the court again denied his request, reaffirming its accreditation of appointed counsel:

THE DEFENDANT: Judge . . ., I'm a layman in the law. I cannot represent myself. And I never got a chance to rebut the allegations that [appointed counsel] made. You just took that information to be true because of his position, and those things just – is falsified. It's falsified allegations that he made toward me.

THE COURT: You're right. I didn't have a full hearing. I took his statement as true. And I did that because, as an officer of the court, when he makes a statement of that sort, I believe him. And I know you've stated on a couple of occasions that you didn't do those things, and I'll note your statement for the record. But when it comes down to the final analysis, I believe [appointed counsel] is telling me the truth.

. . . .

-5-

. . . [Y]ou all were the only two back there and so he says it did happen; you say it didn't happen. I'm going to believe what he said.

The defendant responded that he and appointed counsel were not alone when the alleged incident took place, asserting that a "sheriff" and "plenty [of] inmates" were present. However, the trial court ruled that there would not be a hearing and that the case would "proceed as is."

The defendant proceeded *pro se*,[1] but the trial court subsequently appointed advisory or "elbow" counsel to assist him in conducting his defense, ordering that the advising attorney would "be available to talk to [the defendant] and confer with [him] during recesses, but [could] not sit at counsel table with [him] during the trial." The defendant also represented himself at his sentencing hearing, but the lawyer previously appointed as elbow counsel was permitted to directly represent him at his motion for a new trial and on appeal.

On appeal, the defendant argues that he "suffered a constitution violation [sic] in being denied either counsel or a hearing on the alleged events which precipitated removal of appointed counsel." The State counters that, although there was no formal hearing, the trial court "ultimately heard the defendant's version of events, [and] accredited [appointed] counsel's version of events that the defendant verbally assaulted him on one occasion and physically assaulted him on another occasion." Thus, the State contends that the trial court "properly found in this case that the defendant forfeited his right to counsel and the defendant is not entitled to relief on this claim." We now will review these arguments.

The Constitutions of the United States and Tennessee both guarantee indigent criminal defendants the right to the assistance of appointed counsel at trial. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. However, a criminal defendant can forfeit his constitutionally secured right to counsel by engaging in extremely serious misconduct. See State v. Carruthers, 35 S.W.3d 516, 548 (Tenn. 2000) (discussing at length the difference between "implicit waiver" of the right to counsel and "forfeiture" of that right) (citing United States v. Goldberg, 67 F.3d 1092, 1102 (3d Cir. 1995); City of Tacoma v. Bishop, 920 P.2d 214, 218 (Wash. Ct. App. 1996)). A defendant who has engaged in such extremely serious misconduct may forfeit his right to counsel "even though [he] was not warned of the potential consequences of his or her actions or the risks associated with self-representation." Id. In such circumstances, "forfeiture results regardless of the defendant's intent to relinquish the right and irrespective of the defendant's knowledge of the right." Id.

Forfeiture is an extreme sanction. Id. at 550. As such, our supreme court cautioned that a finding of forfeiture is proper only in limited circumstances:

We reiterate that a finding of forfeiture is appropriate only where a defendant egregiously manipulates the constitutional right to counsel so as to delay, disrupt, or

---

[1] Two years and five months passed between the time appointed counsel withdrew and the beginning of the defendant's trial.

> prevent the orderly administration of justice. Where the record demonstrates such egregious manipulation a finding of forfeiture should be made and such a finding will be sustained, even if the defendant is charged with a capital offense.

Id.

Defendants who are physically abusive toward their court-appointed lawyers may forfeit their constitutional rights to the assistance of counsel. See United States v. Leggett, 162 F.3d 237, 250 (3d. Cir. 1998) (concluding that "unprovoked physical battery . . . qualifies as the sort of 'extremely serious misconduct' that amounts to the forfeiture of the right to counsel") (quoting Goldberg, 67 F.3d at 1102). In such cases, the trial court may properly require an indigent defendant to proceed *pro se*. However, this court must have an adequate record on which to evaluate such a finding. See State v. Michael Small, No. W2003-02014-CCA-R3-CD, 2006 WL 3327845, at *3 (Tenn. Crim. App. Nov. 15, 2006) (remanding for a hearing to determine whether the defendant had forfeited or waived his right to counsel because the record was devoid of specific factual findings regarding what transpired between trial counsel and the allegedly physically abusive defendant).

In this matter, the trial court did not conduct a hearing, at which the defendant would have been allowed both to testify and present witnesses on his behalf, before concluding that he had waived his right to counsel. Rather, it is apparent from the record that the trial court accredited appointed counsel's account of what transpired at their meeting the morning of the withdrawal, but in light of the defendant's assertions that there were witnesses to the altercation, we must remand for consideration of this issue. We note that the State has the burden of establishing that the defendant forfeited his right to counsel. The procedures which should be followed at the hearing are set out in State v. Christopher Perry, No. W2004-03004-CCA-R3-CD, 2005 WL 3533338 (Tenn. Crim. App. Dec. 22, 2005), and State v. William Chouinard, No. 03C01-9311-CR-00357, 1995 WL 50752 (Tenn. Crim. App. Feb. 9, 1995).

If the trial court finds that the defendant's right to counsel was violated, the court then should vacate the judgment of conviction and sentence and order a new trial. However, if the trial court concludes, following an evidentiary hearing, that the defendant forfeited his right to counsel by being physically abusive, then the defendant may appeal that determination.

## II. Lesser-Included Offenses

At the trial of this matter, the trial court instructed the jury as to aggravated rape and the lesser-included offense of rape. The defendant argues on appeal that the court should have instructed as to the additional lesser-included offenses of aggravated sexual battery, sexual battery, and assault. However, the defendant failed at trial to file a written request that the jury be instructed as to these offenses. Thus, according to the dictates of Tennessee Code Annotated section 40-18-110(c), this issue is waived, and we may not consider it unless it rises to the level of plain error. See State v. Page, 184 S.W.3d 223, 226 (Tenn. 2006). The State argues that it does not, both because the defendant admitted he penetrated the victim, leaving consent as the only issue, and failed to show

that he did not decide, for tactical reasons, not to afford the jury another lesser-included offense which it might use to resolve the contending claims as to whether the penetration was forcible.

Given that the sole issue in this trial was whether the sexual relations were consensual, we cannot conclude that the fact the instructions did not include the additional lesser offenses does not result in especially egregious error which strikes at the fairness of the proceedings. See State v. Atkinson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). This claim is without merit.

### III. Sufficiency of the Evidence

The defendant argues that the State's evidence was not sufficient, asserting that the State failed to show that the victim had suffered a bodily injury. Not surprisingly, the State disagrees.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The elements of aggravated rape, as set out in Tennessee Code Annotated section 39-13-502, are unlawful sexual penetration, defined by section 39-13-501(7) as an "intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the

defendant's, or any other person's body," committed with intent, knowledge or recklessness and accompanied by, among other things, bodily injury to the victim. Tennessee Code Annotated section 39-11-106(a)(2) defines "bodily injury" as a "cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."

As to his claim that the evidence was insufficient to support his conviction for aggravated rape, the defendant relies on the holding in State v. Henderson, 623 S.W.2d 638, 639 (Tenn. Crim. App. 1981), wherein the court found that the victim's "'emotional reaction' to the offense rose to the level of an impairment of her mental faculties, temporary or otherwise." By contrast, in the present matter, the victim, asked if she had suffered physical pain as the result of the rape, testified, "My head was hurting. I had knots on my head." We conclude that this testimony as to the victim's physical pain was sufficient to establish the bodily injury element of aggravated rape. It is apparent from the verdict that the jurors accredited the victim's testimony, as was their right. Accordingly, this claim is without merit.

### IV. Instruction as to "Bodily Injury"

The defendant argues that the trial court "supplied the jury with improper supplemental instructions" as to the definition of "impairment of mental faculty."

During deliberations, the jury asked for a definition of the phrase "impairment of mental faculty." The court solicited appropriate definitions and then utilized Webster's Dictionary and Black's Law Dictionary in its instruction, which was as follows:

> Impairment is – to impair, of course, is to cause – to diminish as in strength of quality. And the noun form of that – impairment – would be the condition that exists when something is diminished in strength or quality.
>
> "Mental" would be relating to or existing in the mind.
>
> And "faculty" would be any of the powers or capacities by the human mind – the ability to perform or act.

Although referring this court to his argument regarding insufficiency of the evidence, the defendant does not identify what, in his view, is wrong with this definition given by the trial court. While we surmise the defendant's claim may be that the trial court should have instructed the jury that an emotional reaction to rape does not constitute an impairment of mental faculties, we cannot be certain that this is the case. Accordingly, this claim is waived. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

The defendant argues as well that the trial court should have instructed the jury "not to place undue emphasis on the supplemental instructions." The State responds that, while the giving of such

an additional instruction would have been the better procedure, the fact the court did not do so does not require a reversal of the conviction.

As the defendant correctly notes, reversible error does not necessarily result from the fact the trial court did not instruct that the supplemental instruction must be considered with the entire charge. See State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). Considering the entire charge, and the fact that the State utilized the victim's testimony as to her physical pain to establish the bodily injury element of aggravated rape, we conclude that the error in not providing the additional instruction was harmless beyond a reasonable doubt.

## V. Crying by the Victim and the Prosecutor

The defendant argues that he was denied a fair trial because one of the prosecutors and the victim cried during closing argument. The State responds that the defense made no objection to alleged crying during closing argument and, at the hearing on motion for new trial, made only general claims in this regard. Thus, in addition to no objections being made as the crying allegedly was occurring, the record does not reveal its alleged extent. Accordingly, this claim is waived. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

The defendant also complains of brief statements made in the State's final argument, which followed a lengthy closing argument made by the defendant himself. The State's arguments, of which the defendant now complains, were statements that the jury should be "proud" of the victim for testifying, that the defendant was the one with an interest in the outcome of the case, and several other similar statements. None of these statements were objected to at the trial. In view of the defendant's very detailed closing argument, we conclude that, taken in context, the statements as to which the defendant now complains were fair responses to his own argument.

This assignment is without merit.

## VI. Limitations of Defendant's Proof

On appeal, the defendant complains that the trial court erred (1) in disallowing his proof that, several years after the rape of the victim, she stated in an application for order of protection that she had run away after being struck in the face by her boyfriend and (2) by refusing to allow him to recall the State's witness, Sergeant Crowe, to ask about alleged inconsistencies between the victim's statement to him and her testimony at trial. We will review the manner in which these issues arose at trial.

At the conclusion of the testimony of the victim on direct examination, the defendant apparently asked that he be allowed to cross-examine her about seeking an order of protection several years after the rape had occurred:

Your Honor, I wanted to bring out – and even during the direct exam, it was mentioned that sworn testimony has not been given before a judge by the victim; but earlier this year, 2005, January 25th, sworn testimony had been given by the victim on an order of protection about the same Ephram that continually being [sic] mentioned as her baby's daddy or boyfriend at that time.

The trial court concluded that this line of questioning was irrelevant:

[THE COURT]:  I don't think that there, in my opinion, is sufficient nexus or connection between the events that are on trial this week and some order of protection that was sought four years later against a different individual, different circumstances, different parties.  We're just, again, talking apples and oranges – two completely different situations.  There is no pattern; there is no proximity in time or place or parties, so I don't – I think it's unfair and illogical to try to draw any connection between the two incidents or infer any impeachment based on some order of protection that was sought four years later by – I guess sought by her against the father of her child is that what you said?

[THE DEFENDANT]:  For an assault that had happened, and she vacated whatever location they had been in.

THE COURT:  So what would be the question[?]  What relevance would there be?

[THE DEFENDANT]:  And the extreme of what happened during 2001 was somewhat worse as being alleged and you stayed?

THE COURT:  Well, those are just matters the jury is going to have to weigh.  That's for the jury to determine; whether they believe her testimony or not.  That's a matter of credibility, but the fact that she might have been arguably – for argument sake, let's assume that she was caught up in another situation four years later and she left.  Well, those might be completely different circumstances with different people.  You weren't involved in that one in 2005 because you were in jail.  So it was a different person.  I don't know.  I have no idea of what the personalities were or the circumstances were in 2005 in an incident that involved an order of protection.  So there's not a sufficient connection in facts, in time, in parties, in events, to allow one to be introduced – the 2005 one to be introduced to try to draw some impeachment of the 2001 conduct – completely different.

This court will not reverse the decision of a trial court to exclude evidence based on its lack of relevance unless the trial court has abused its discretion.  See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997) (citations omitted).  Abuse of discretion, in this context, essentially, contemplates a situation where the "court applied an incorrect legal standard, or reached a decision which is

against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)). Accordingly, "[a]lthough a decision made under this standard will not be lightly reversed on appeal, the discretion of the trial court is not without limits." State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000). We cannot conclude that the trial court abused its discretion in finding that the matters about which the defendant sought to cross-examine the victim were irrelevant.

As the second part of this issue, the defendant asserts that the court erred in refusing to allow him to recall Sergeant Crowe to question him about "a lot of inconsistencies" between the victim's trial testimony and the statement she had given to Crowe. The trial court then explained that the defendant had failed, during the cross-examination of the victim, to lay a foundation for subsequent questions about her statement:

> The only way you can question him about it is if [the victim] denied something in the statement that she gave – denied that she made that statement. Then you could call him to the stand to prove that, yes, she did make that statement. I don't recall her denying anything about the statement when you asked her on cross examination.

After listening to the defendant explain each of the portions of the victim's statement about which he wanted to question Sergeant Crowe, the court again explained that the defendant had failed to lay a foundation for such questions:

> But if that's the reason you wanted to call Sergeant Crowe, in order to impeach her with this prior statement, I don't find that any of those matters were properly submitted to [the victim] for her to explain what – the few that were [sic], she did explain away – like the 3:30 in the afternoon. That you did ask her about that. You did say, "Isn't it true you told – in the statement told the police that it was 3:30 when you were smoking mari[j]uana?" And she explained it away. She said, "Well, maybe it was 3:30. I don't really remember. It's been four and a half or five years." So, that's fine.

Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same . . . ." We have examined the record and agree with the trial court that the defendant failed to question the victim about portions of her statement which, in his view, were inconsistent with her trial testimony. Accordingly, the record supports this determination by the trial court.

-12-

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we remand this matter to the trial court for an evidentiary hearing as to whether the defendant forfeited his right to counsel.

_____
ALAN E. GLENN, JUDGE